### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### HUNTINGTON DIVISION

CHARLES EDWARD MURPHY,

       Plaintiff,

v.                                 Case No. 3:20-cv-00409

CORPORAL AKERS, *et al.*,

       Defendants.

### PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

#### I.    *RELEVANT PROCEDURAL HISTORY*

This matter has a somewhat convoluted procedural history that warrants some discussion. The case is proceeding on Plaintiff's amended complaint (ECF Nos. 2 and 42) alleging that his Eighth Amendment rights were violated when, during an altercation with correctional staff, he was pepper sprayed and placed into a restraint chair, with a spit mask placed over his face, and without receiving a decontamination shower, for more than four hours.

Plaintiff has named as defendants the following correctional officers who were involved in his take down and restraint: Cpl. Pierce Akers ("Akers"), COI Shawn Chaffin ("Chaffin"), Sgt. Fred Ferguson ("Ferguson"), Cpl. Mary Hendricks ("Hendricks"), and COI Taylor Littlejohn ("Littlejohn"). Plaintiff claims that it was "cruel and unusual

punishment" for these defendants to place him in the restraint chair for approximately four hours without giving him a decontamination shower when he was otherwise compliant, burning, and struggling to breathe.  Plaintiff alleges an additional Eighth Amendment violation by nurse, Ashley Vallandingham ("Vallandingham") grounded in her medical "clearance" of him prior to being "decontaminated," despite Plaintiff telling her that his eyes were burning and that he had pepper spray in his mouth and could not breathe.

Following service of process, Defendants Akers, Chaffin, Ferguson, Hendricks, and Littlejohn (collectively "the Correctional Defendants") answered the complaint, while Defendant Vallandingham, who was first fully identified in the amended complaint (ECF No. 42), filed a motion to dismiss.  On January 8, 2021, the undersigned entered an order and notice setting a briefing schedule for Vallandingham's motion to dismiss, as well as deadlines for discovery and dispositive motions. (ECF No. 68).  The dispositive motion deadline was July 1, 2021.  The court's order and notice also included a notice pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) (hereinafter "*Roseboro* notice"), advising Plaintiff of his right and obligation to respond to any motions for summary judgment filed by Defendants.

Vallandingham's motion to dismiss was denied by the presiding District Judge on July 1, 2021 (ECF No. 91), which was also the date that summary judgment motions were due.  On that same date, the Correctional Defendants timely filed their motion for summary judgment (ECF No. 92) and memorandum of law in support thereof (ECF No. 93).  Plaintiff did not file his own motion for summary judgment at that time, despite the fact that any such motion was expected to be filed by that date.

2

On July 2, 2021, the undersigned entered an order and notice disposing of an outstanding discovery motion and directing Plaintiff to identify any additional discovery that might be needed concerning his claim against Vallandingham. (ECF No. 94). The order and notice also set out a briefing schedule for the Correctional Defendants' motion for summary judgment and provided Plaintiff with another *Roseboro* notice. (*Id.*) Plaintiff's response to the Correctional Defendants' motion for summary judgment was due by August 2, 2021. (*Id.*) However, Plaintiff failed to file a timely response.

After determining that no additional discovery was needed concerning the claim against Vallandingham, the undersigned entered another order and notice setting a separate schedule for motions for summary judgment concerning that claim, with such motions being due by July 21, 2021. (ECF No. 96). Neither Vallandingham, nor Plaintiff, filed a motion for summary judgment by that deadline.

However, two months later, on September 21, 2021, Vallandingham filed her motion for summary judgment (ECF No. 97) and memorandum of law in support thereof (ECF No. 98). The undersigned then issued an order to show cause directing Vallandingham to justify the late filing of her motion. (ECF No. 99). Ultimately, the undersigned found good cause for the delay and deemed Vallandingham's motion filed on September 21, 2021 to be timely. The undersigned also set a revised schedule for a response and reply to that motion and included yet another *Roseboro* notice for Plaintiff. (ECF No. 101).

On October 4, 2021, Plaintiff timely responded (ECF No. 102). However, his response largely addresses the Plaintiff's claims against the Correctional Defendants and seemingly seeks summary judgment on Plaintiff's behalf without leave of court to

3

belatedly file such a motion.  (*Id.*)  To the extent that Plaintiff's response is treated as a motion for summary judgment as well as a response to the Correctional Defendants' motion, the Correctional Defendants assert that it an untimely filing.  (ECF No. 103 at 1).  Defendants' replies further assert that Plaintiff has failed to develop evidence that any of the Defendants violated his clearly established rights under the Eighth Amendment.  Thus, Defendants assert that they are entitled to qualified immunity and judgment as a matter of law on all of Plaintiff's claims against them.  (ECF Nos. 103 and 104).  These motions are fully briefed and ripe for resolution.

## II.    SUMMARY OF MATERIAL FACTS[1]

Plaintiff is a sentenced state prisoner who, on January 4, 2020, was being housed at the Western Regional Jail ("WRJ") in Barboursville, West Virginia.  As demonstrated by video evidence offered with the Correctional Officer Defendants' motion, Plaintiff had become increasingly agitated by verbal exchanges with Akers, other correctional staff, and another inmate in an adjoining holding cell in the jail's booking area and had threatened to destroy property in his holding cell.  The video evidence confirms that, at approximately 4:29 p.m.,[2] while Ferguson was transferring Plaintiff from the holding cell to a segregation cell in another area of the jail, Plaintiff lunged over the booking counter to attack Akers.  Littlejohn was also behind the counter.  Plaintiff admits that he punched

---

[1] These facts are derived from the incident reports and video evidence offered by the Defendants, testimony from Plaintiff's deposition, and the parties' written discovery responses, all of which are attached as exhibits to their motions or other briefs.  (ECF Nos. 92 and 97).  Because the parties did not provide a complete copy of Plaintiff's deposition with their filings, the undersigned directed Defendants to supplement the record with a complete copy of the deposition transcript, which is located in ECF No. 106, Attach. 1, Ex. 1.

[2] It is apparent from the video and documentary evidence presented with the parties' briefs that the timeline alleged in Plaintiff's complaint is inaccurate.  It is undisputed that Plaintiff attacked Defendants Ferguson and Akers at 4:29 p.m., not noon, as alleged in the initial complaint.

Ferguson and Akers and attempted to stab Akers with an ink pen.  (ECF No. 106, Ex. 1 at 14-18).[3]

As the officers attempted to gain control of Plaintiff, who initially resisted and failed to comply with orders to cease his behavior, Hendricks responded from another area of the facility.  She obtained a container of MK9 Oleoresin Capsicum spray ("OC spray") and deployed multiple ½ second bursts of the OC spray down the booking counter towards Plaintiff and the other officers.  Shortly thereafter, Plaintiff was subdued and taken down to the ground.  He was thereafter handcuffed and shackled.  As discussed in further detail *infra*, Plaintiff contends that he was pepper sprayed a second time after he was on the ground and shackled.

Ferguson, the shift supervisor, ordered that Plaintiff be placed into a restraint chair.  Defendants contend that, after being placed in the restraint chair, Plaintiff spit at Littlejohn while she was restraining his right ankle.  Consequently, Ferguson ordered that a spit mask/hood be placed over Plaintiff's face.  (ECF No. 93 at 4; ECF No. 95 at 4:37:28).  Plaintiff maintains that he was spitting OC spray that had gotten into his mouth into his lap and that he was not attempting to spit on any officers.  (ECF No. 16, Ex. 1 at 35-38).

As instructed by Ferguson, Plaintiff was then moved in the restraint chair to another room where he was monitored for approximately four hours.  After Plaintiff was wheeled out of sight on the surveillance video, a voice, presumed to be Plaintiff's, can periodically be heard yelling that he could not breathe and another male voice, possibly that of Ferguson, who says "I don't feel sorry for you."  (ECF No. 95 between 4:40.08 and

---

[3]  When citing to Plaintiff's deposition transcript, the undersigned will use the pagination associated with the actual deposition transcript found in Attachment 1 of ECF No. 106.

4:41:00). However, there is no video evidence showing Plaintiff's behavior or condition once he was removed from the booking area. Nor are there any written incident reports or any written narrative, other than an extremely general offender watch log (ECF No. 103 at 111), concerning Plaintiff's conduct after he left the booking area.

It is undisputed, however, that Plaintiff was attempting to chew through the spit mask while he was confined in the restraint chair. (ECF No. 106, Ex. 1 at 51-52). Plaintiff maintains that he did so because he could not breathe. (*Id.*) He further acknowledges that the use of a spit mask ceased after he was in the chair for about one hour. (*Id.*) Defendants maintain that Plaintiff's behavior justified keeping him in the restraint chair. (ECF No. 93 at 5).

As soon as Plaintiff was removed from the booking area, Akers, Hendricks, and Littlejohn returned to their normal duties and Ferguson left the area to file a criminal complaint against Plaintiff with the West Virginia State Police. (ECF No. 92, Exs. 6 and 9; ECF No. 95 after 4:39; ECF No. 106, Ex. 1 at 58-63).[4] Ferguson then left the jail at the end of his shift without releasing Plaintiff. Defendants' discovery responses, particularly those of Ferguson, maintain that Plaintiff continued to make threats of violence and aggressive actions and that Ferguson determined that Plaintiff remained a threat to the safety of staff throughout the time he was in the restraint chair, until Ferguson left the jail. The discovery responses of all Defendants further assert that Plaintiff was given a shower as soon as he became compliant and the safety of the officers was insured.

---

[4] Plaintiff subsequently pled guilty to one count of battery on a correctional officer. (ECF No. 92, Ex. 8).

According to a watch log maintained during the period that Plaintiff was in the restraint chair, Plaintiff's monitoring began at 1640 (4:40 p.m.) and he was checked approximately every 15 minutes by correctional officers, namely Chaffin, and he was further periodically examined by Vallandingham. (ECF No. 102 at 111). Plaintiff contends that, during this time, Chaffin made inappropriate comments to him, stating that he hoped he could not breathe, and that the OC spray was burning him. (ECF No. 106, Ex. 1 at 55, 64). Defendants have not offered any sworn statements, incident reports, or other evidence concerning Chaffin's conduct during this time.

However, Plaintiff further testified that, after he told Vallandingham he couldn't breathe, she asked the correctional staff if the spit mask could be removed, but her request was denied. Plaintiff further acknowledged that Vallandingham was trying to help him and that he named her as a defendant in this matter largely because he believed that would make it easier for her to be a witness. (ECF No. 106, Ex. 1 at 77-80).

Following the shift change, Plaintiff was released from the restraint chair by the evening shift commander, Lt. Paul Diamond, and was given a decontamination shower around 2045 (8:45 p.m.). (*Id*. at 53). Thereafter, he was moved to a segregation cell. (*Id*. at 66). There is some dispute, however, about how long he was held in segregation at the WRJ. Plaintiff's complaint alleged that he was in segregation from January 4, 2020 to January 9, 2020. Defendants' briefs also contend that Plaintiff was released from segregation to the jail's general population on January 9, 2020. However, during his deposition, Plaintiff clarified that he was held in segregation until he was transferred to the Mount Olive Correctional Complex ("MOCC") on or about January 20, 2020. It is undisputed that Plaintiff did not file any grievances concerning the incident or

Defendants' alleged conduct.  Plaintiff maintains that he was advised that he could not file a grievance while he was in segregation or after his transfer to MOCC because he did not have access to the jail's electronic kiosk system.  He states that he was led to believe that he could not file a paper grievance by mail.[5]

Plaintiff has acknowledged that, because he assaulted the officers, some amount of force was reasonable and necessary and he concedes that the officers handled the matter "how they were supposed to handle it," including the initial deployment of OC spray by Hendricks, until he was down on the ground.  Thus, his deposition testimony seemingly narrows the scope of his claims; however, his testimony was somewhat inconsistent.

On the one hand, Plaintiff testified "my case is cruel and unusual punishment for putting me in a chair without giving me a shower and putting the spit mask on me for however long they did it without giving me a shower.  That is cruel and unusual punishment."  (ECF No. 106, Ex. 1 at 15).  He further testified, "my complaint is after I was sprayed, I wasn't given a decontamination shower to wash the OC off.  Therefore, I sat in the chair for hours going through pain."  (*Id.* at 55-56).  This testimony suggests that Plaintiff is not challenging any use of OC spray or his physical takedown and is only alleging that his placement in the restraint chair without being decontaminated, and the further use of a spit mask, was cruel and unusual punishment.

---

[5]  Indeed, the applicable policy directive governing the grievance process, WVRJA policy statement 14003, which has been made a part of the record before the court, does not address the use of the electronic kiosk system and is also silent with respect to the filing of paper grievances by mail from another facility. Amended policy directives do specify that a grievance may be initiated and appealed through the United States Mail, but those versions of the policy were not in effect during the operative period addressed in this complaint.  (*See* ECF No. 107, Ex. 2, West Virginia Division of Corrections and Rehabilitation Policy Directive 335.00, effective February 15, 2020 (less than one month after the incidents that are the subject of this civil action), which was adopted when the state regional jails and prisons were collectively placed under the governance of the West Virginia Division of Corrections and Rehabilitation ("WVDCR") and replaced WVRJA policy statement 14003).

However, Plaintiff additionally testified that he was sprayed with OC spray a second time while he was down on the ground and his complaint also summarily alleged that a second such spraying occurred; however, he cannot confirm whether the OC spray was again deployed by Hendricks or someone else. (ECF No. 2 at 4, 10; ECF No. 106, Ex. 1 at 20-22, 31-34). Although Plaintiff repeatedly claims that this second spraying occurred, it is not readily apparent on the surveillance video.

Nevertheless, the undersigned will treat Plaintiff's Eighth Amendment claims as being grounded in the following conduct: (1) the alleged second deployment of OC spray while Plaintiff was down on the ground and being compliant while being restrained; and (2) the placement of Plaintiff in the restraint chair and spit mask, despite being compliant and without being decontaminated, for a period of four hours, all in deliberate indifference to his breathing difficulties, burning, and pain suffered from OC spray still being on his body and clothing.

## II.    LEGAL STANDARDS

### A.    Summary judgment under Fed. R. Civ. P. 56.

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material when it 'might affect the outcome of the suit under the governing law.'" *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute arises when 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted). "The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). In ruling on a motion for summary judgment, this Court "view[s] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Jones v. Chandrasuwan*, 820 F.3d 685, 691 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)). Additionally, the court must not resolve disputed facts or weigh the evidence and may not make credibility determinations. *Russell v. Microdyne Corp., 65 F .3d* 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986).

B.    *Qualified immunity.*

Defendants assert that they are entitled to qualified immunity on Plaintiff's claims against them. The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "Qualified immunity is an affirmative defense intended to shield public officials from civil suits arising out of their performance of job-related duties" and "[o]fficials are protected even if they make reasonable mistakes of fact or law, so long as they do not violate a clearly established statutory or constitutional right." *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

To determine whether a government official is entitled to qualified immunity on federal constitutional claims, the court must determine: "(1) whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the official's actions violated a constitutional right; and (2) whether that right was clearly established such that a reasonable person would have known their conduct was unlawful. *See Meyers v. Balt. County*, 713 F.3d 723, 731 (4th Cir. 2013) (citing *Saucier v. Katz*, 533 U.S. 194 (2001))

## III.   DISCUSSION

Defendants Akers, Chaffin, Ferguson, Hendricks, and Littlejohn have collectively filed a motion for summary judgment (hereinafter the "Correctional Officers' motion") contending that Plaintiff has failed to demonstrate that they violated his Eighth Amendment rights and asserting that they are entitled to qualified immunity and judgment as a matter of law on Plaintiff's claims. They further contend that Plaintiff failed to exhaust the required administrative remedies before filing his complaint. (ECF Nos. 92 and 93). Defendant Vallandingham has also filed a motion for summary judgment making similar arguments. (ECF Nos. 97 and 98). The undersigned will first address the exhaustion defense raised by Defendants before turning to the merits of the parties' other arguments.

### A.   Exhaustion of administrative remedies.

Defendants assert that Plaintiff wholly failed to initiate and exhaust the jail's administrative remedy process concerning his claims for relief. Section 1997e(a) of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which contains the exhaustion requirement, was enacted "to address concerns about the 'ever-growing number of prison-condition lawsuits that were threatening to overwhelm the capacity of

11

the federal judiciary.'" *Green v. Young*, 454 F.3d 405, 406 (4th Cir. 2006) (quoting *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 676 (4th Cir. 2005)).  "The PLRA imposes some rather substantial limitations on a prisoner's ability to initiate a civil action." *Id.*  One such limitation is the requirement that prisoners exhaust administrative remedies within the prison before filing a civil action." *Id.*

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any . . . correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Such exhaustion is mandatory regardless of the type of relief sought or offered through the administrative procedures and so long as the grievance tribunal has authority to take some responsive action.  *Booth v. Churner*, 532 U.S. 731, 741 (2001).

"Not only must a prisoner exhaust his administrative remedies, but he must also do so properly." *Wells v. Parkersburg Work Release Ctr. et al.*, No. 2:15-cv-04103, 2016 WL 696680, at *3 (S.D. W. Va. Jan. 19, 2016).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)).

Like the PLRA, the West Virginia Prison Litigation Reform Act ("WVPLRA") "require[s] inmates to exhaust their administrative remedies before they bring a lawsuit."

*Legg v. Adkins*, No. 2:16-cv-01371, 2017 WL 722604, at *2 (S.D.W. Va. 2017) (citing 42 U.S.C. § 1997e(a); W. Va. Code § 25-1A-2a(i)). Under the WVPLRA, "[a]n inmate may not bring a civil action regarding an ordinary administrative remedy until the procedures promulgated by the agency have been exhausted." W. Va. Code § 25-1A-2(c). The WVPLRA defines an ordinary administrative remedy as "a formal administrative process by which an inmate submits a grievance seeking redress or presenting concerns regarding any general or particular aspect of prison life . . . . An ordinary administrative remedy includes, but is not limited to, . . . staff treatment or some other alleged wrong." *Id.* § 25-1A-2(a). Under the WVPLRA,

> An ordinary administrative remedy is considered exhausted when the inmate's grievance complies with duly promulgated rules and regulations regarding inmate grievance procedures, has been accepted, fully appealed and has received a final decision from the Commissioner of Corrections or the Commissioner's designee, or the Executive Director of the Regional Jail Authority, or the Director's designee.

W. Va. Code § 25-1A-2(d).

Whether an administrative remedy has been exhausted for purposes of the PLRA "is a question of law to be determined by the judge." *Creel v. Hudson*, No. 2:14-cv-10648, 2017 WL 4004579, at *3 (S.D.W. Va. 2017) (citing *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010)). In *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016), the Supreme Court held that "the exhaustion requirement hinges on the 'availability' of the administrative remedies. An inmate . . . need not exhaust unavailable remedies." *Id.* The Court further defined "available" as "'capable of use' to obtain 'some relief for the action complained of.'" (*Id.* at 1859, citing *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

13

Plaintiff does not dispute that he did not exhaust the WRJ's administrative remedy process concerning the claims raised in his amended complaint.  However, contrary to Defendants' assertion that he was released from segregation after five days and could have undertaken the exhaustion process at that time, Plaintiff contends that he remained in segregation until January 20, 2020, without access to the jail's kiosk system, which was allegedly used to file grievances, and that he was then transferred to MOCC and was told he could not file a grievance concerning conduct at the WRJ from there.  Thus, he essentially asserts that the administrative remedy process was not available to him during the operative period in which he should have filed a grievance.

Defendants did not provide the governing document setting forth the specific grievance procedures that were in place at the WRJ at the time of these incidents with their motions.  Consequently, the undersigned ordered Defendants to supplement the record with a copy of the written policy directive setting forth the applicable grievance procedures that were in effect during the operative period.  As provided by Defendants, the applicable policy was contained in West Virginia Regional Jail and Correctional Facility Authority ("WVRJA") Policy and Procedure Statement No, 14003, which took effect on July 22, 2014.  (ECF No. 107, Ex. 1) (hereinafter "the policy directive").

The policy directive states that, regardless of classification, inmates shall have access to the grievance process and shall receive an inmate handbook explaining the grievance procedures.  (*Id*. at 2).  The policy directive speaks of a written grievance form and makes no mention of the electronic kiosk system (which the undersigned believes was instituted much later than the written policy directive).  The policy directive states that a written grievance form should be placed in an envelope addressed to the facility

14

administrator, which would then be delivered to the administrator by facility staff "within a reasonable time, normally no later than the end of the shift." (*Id.* at 3). The policy directive is silent with respect to any procedures for filing a grievance after leaving the specific facility where the subject conduct occurred.

It is undisputed that Plaintiff was immediately placed in segregation following his release from the restraint chair and receiving a decontamination shower. During his deposition, Plaintiff clarified that he was held in segregation until January 20, 2020, when he was immediately transferred to MOCC and told that he could not file a grievance from there. (ECF No. 106, Ex. 1 at 66-70). While the policy directive suggests that Plaintiff should have been able to file a written grievance while he was housed in segregation at the WRJ, he contends that he believed that he must do so on the electronic kiosk system, to which he claims he had no access while in the segregation unit. (*Id.*)

Moreover, Plaintiff testified that, once he was transferred to MOCC, he was told that he could not file a grievance because he did not have access to the electronic kiosk used by the WRJ and, further it was his understanding that he could not file a paper grievance by mail from another facility - a process which was not clearly delineated in the applicable policy directive. (*Id.*) Thus, Plaintiff testified that he "did not have the proper methods to file a grievance." (*Id.* at 70).

This evidence demonstrates the opaqueness of the subject policy and calls into doubt the availability of the grievance process to Plaintiff under the circumstances. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Defendants have not demonstrated that they are entitled to judgment as a matter of law for Plaintiff's failure to exhaust administrative remedies because it is not apparent that

the administrative remedy process was available to Plaintiff during the operative period when he could have initiated a timely grievance and properly exhausted the same. Thus, Defendants' motions for summary judgment on this basis should be denied.

   B.   *Plaintiff's claim against Vallandingham.*

Vallandingham's motion for summary judgment asserts that Plaintiff has failed to establish that she acted with deliberate indifference to his serious medical needs by "medically clearing" him while he was in the restraint chair without being decontaminated and despite allegedly being advised that he was burning and couldn't breathe. Vallandingham's motion relies upon Plaintiff's deposition testimony that he believed that she was trying to help him and that he essentially named her as a defendant so that he could drop the lawsuit against her and have her as a witness. (ECF No. 106, Ex. 1 at 77-80). Additionally, Plaintiff acknowledged that Vallandingham's request to have the spit mask removed (which was rejected by correctional staff) demonstrated that her actions were not cruel and unusual. (*Id.* at 80). Thus, Vallandingham asserts that Plaintiff has not demonstrated an Eighth Amendment violation based upon her conduct and that she is entitled to qualified immunity and judgment as a matter of law on Plaintiff's claim against her.

Plaintiff's response does not specifically discuss his claim against Vallandingham or any evidence concerning her conduct. At best, he summarily asserts in a conclusory manner that "[e]ach Defendant in this civil action had a part in refusing me a shower and I told each Defendant in this civil action that I couldn't breathe and I was burning and they ignored my pleas and did so in a blatant and malicious way. This is cruel and unusual punishment." (ECF No. 102 at 3).

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" This is a low standard. The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833.

To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." *Id.* at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990); *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (collecting cases). "Serious medical needs" are those which have

17

been diagnosed by a physician as mandating treatment or that are so obvious that even a

lay person would easily recognize the necessity for a doctor's attention. *Gaudreault v.*

*Munic. of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990).

> Deliberate indifference may be demonstrated by either actual intent or reckless disregard. *See Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. *See id.* Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. *See* [*Estelle v. Gamble*, 429 U.S. 97, 106 (1976)].

*Miltier*, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need is

very high.  It is well-settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

*Rush v. VanDevander*, 2008 WL 495651 (W.D. Va., Feb. 21, 2008); *Banks v. Green Rock*

*Correctional Center Medical Dept.*, 2007 WL 2903673 (W.D. Va., Oct. 3, 2007).

However, negligence is not sufficient to demonstrate deliberate indifference to a serious

medical need.  *See Webster v. Jones*, 554 F.2d 1285 (4th Cir. 1977).

Likewise, disagreements between a health care provider and the inmate over a

diagnosis and the proper course of treatment are not sufficient to support a deliberate

indifference claim, and questions of medical judgment are generally not subject to judicial

review.  *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d

318, 319 (4th Cir. 1975).  As noted by the Fourth Circuit, an inmate is not entitled to

unqualified access to health care and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate. *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

Even presuming that Plaintiff could establish that his temporary breathing problems and pain/burning from effects of the OC spray constitutes a serious medical need sufficient to establish the objective prong of the Eighth Amendment standard, he has not presented evidence demonstrating that Vallandingham had a "culpable state of mind" or that she acted with "deliberate indifference" to his medical needs. Instead, Plaintiff has confirmed that Vallandingham was trying to help him and that her rejected attempt to have the correctional officers remove the spit mask was not cruel and unusual punishment by her. Moreover, Plaintiff has failed to demonstrate that Vallandingham had any responsibility for placing and holding Plaintiff in the restraint chair or for directing that he be given a shower.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact concerning Vallandingham's conduct and that she is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim against her. Furthermore, to the extent that Plaintiff's request for summary judgment made in his response document (ECF No. 102) is deemed to be a valid motion for summary judgment on his behalf, that motion should be denied.

### C.    *Plaintiff's claims against the Correctional Defendants.*

The claims against the various correctional officers are also governed by the Eighth Amendment. However, to the extent that Plaintiff has alleged that OC spray was unnecessarily used a second time while he was on the ground and being compliant and

his further claim that he was unnecessarily held in the restraint chair and denied a shower as punishment, such claims are generally viewed through the lens of an excessive force claim.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. "The objective component focuses not on the severity of any injuries inflicted, but rather on 'the nature of the force' which must be 'nontrivial.'" *Tedder v. Johnson*, 527 F. App'x 269, 272 (4th Cir. 2013) (quoting *Wilkins v. Gaddy*, 559 U.S. 34 (2010). Under the subjective component, "the state of mind required in excessive force claims is 'wantonness in the infliction of pain.'" *Iko v. Shreve*, 535 F.3d 235, 239 (4th Cir, 2008) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)). It is well-settled that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillan*, 503 U.S. 1, 5 (1992). However, the Supreme Court has found that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." (*Id.*, citing *Hudson,* 503 U.S. at 9 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Turning to the subjective component, the Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6. The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320. The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).

Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury." *Id.* at 322. However, "if a reasonable jury could find, based on inferences drawn under the *Whitley* factors or other evidence, that correctional officers used force maliciously to punish or retaliate against an inmate, then summary judgment is not appropriate." *Dean v. Jones*, 984 F.3d 295, 302–03 (4th Cir. 2021). The undersigned will address each of Plaintiff's alleged Eighth Amendment violations using these standards.

### 1.    Alleged second use of OC spray.

Plaintiff does not appear to contest that the initial use of OC spray by Defendant Hendricks was justified or reasonable under the circumstances. He acknowledges that, given his behavior, such use of force was necessary to gain his compliance and restore order. Thus, Hendricks' initial use of OC spray does not appear to be within the scope of Plaintiff's Eighth Amendment claims. Nonetheless, Defendants' motion documents

assert that such use of force was "applied in a good faith effort to maintain or restore discipline" and that "Plaintiff has developed no evidence that Defendant Hendricks acted "maliciously" and for the "very purpose of causing harm." *Whitley*, 475 U.S. at 320-21. (ECF No. 93 at 13-17). To the extent that Hendricks' initial use of OC spray against Plaintiff is part of his Eighth Amendment claims, the undersigned agrees that Plaintiff has not established that her conduct violated the Eighth Amendment.

However, Plaintiff claims that he was pepper sprayed a second time after he was down on the ground and being restrained. Although he is unable to confirm that it was Hendricks who allegedly sprayed him a second time, his complaint (ECF No. 2 at 4), written discovery responses (ECF No. 102 at 105-06, 108), and deposition testimony (ECF No. 106, Ex. 1 at 31-34) all assert that one of the correctional officers sprayed him after he was on the ground and shackled.

Plaintiff relies on Hendricks' incident report, which states that she deployed "<u>multiple</u> ½ second bursts of OC to get Murphy off Akers." (ECF No. 102 at 115-16). However, her incident report suggests, and the video evidence confirms, that the OC spray was deployed by Hendricks before Plaintiff was taken to the ground. Plaintiff also relies upon the incident report of another correctional officer, Michael Lorraine ("Lorraine"), who was present at the scene, but is not a named defendant. Lorraine's incident report states in pertinent part, "Sergeant Ferguson grabbed Murphy and placed him on the ground while Cpl. Hendricks deployed OC spray." (ECF No. 102 at 119). However, a careful review of the video evidence fails to demonstrate a second use of OC spray after Plaintiff had been taken to the ground.

As noted above, at the summary judgment stage, the facts must be viewed in the light most favorable to the non-moving party, which, in this case, is Plaintiff. However, in *Scott v. Harris*, 550 U.S. 372, 380 (2007), the Supreme Court held that, where evidence exists that so utterly discredits the plaintiff's version of the facts, there can be no "genuine" issue of material fact, and the court should not adopt the contradicted version of the facts for the purposes of ruling on a summary judgment motion. Here, Defendants assert that the video evidence produced with their motion clearly contradicts Plaintiff's assertion that a second deployment of OC spray occurred. The undersigned agrees that no such action is apparent from the video.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that, to the extent that Plaintiff alleges that he was subject to a second use of OC spray by Defendant Hendricks or one of the other Defendants, his assertion is discredited by the video evidence and there is an absence of evidence to demonstrate the same. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that Defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims to the extent that they are grounded in a second alleged deployment of OC spray after Plaintiff was on the ground, restrained, and compliant.

2.    Retention of Plaintiff in restraint chair without decontamination.

Plaintiff also contends that the Correctional Defendants violated his Eighth Amendment rights by holding him in a restraint chair without giving him a decontamination shower for over four hours. It is clearly established that denial of decontamination can give rise to an Eighth Amendment claim. *See Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir. 1996) (affirming denial of summary judgment to prison officials

who refused decontamination to an inmate restrained for more than 8 hours after being maced and without medical examination); *Mann v. Failey*, 578 F. App'x 267 (4th Cir. Jul. 14, 2014) (reversing district court's order granting summary judgment to officers who refused to allow a prisoner to decontaminate after being pepper sprayed while restrained for over six hours); *Wagner v. Warden*, No. ELH-14-791, 2016 WL 7178297 (D. Md. Dec. 8, 2016) (denying qualified immunity to correctional staff who denied an inmate a decontamination shower following pepper spray exposure); *Al-Mujahidin v. Harouff*, No. 9:14-cv-1266-BHH, 2015 WL 5159065, at *6 (D.S.C. Sept. 2, 2015) ("where a prisoner presents evidence that he was sprayed with chemical munitions and then restrained for an extended period of time without any opportunity to decontaminate, summary judgment is not appropriate.")  Additionally, continuing to hold an inmate in a restraint chair unnecessarily for an extended period of time following an incident can give rise to a genuine issue of fact as to whether a constitutional violation occurred. *Williams*, 77 F.3d at 764.

Defendants contend that keeping Plaintiff in the restraint chair, without first decontaminating him, was necessary to protect officer safety because his behavior was still volatile, and he continued to threaten violence after he was placed in the restraint chair.  Although not readily apparent from the surveillance video, Defendant Ferguson's first incident report (No. 00293558) contends that Plaintiff "stated he was going to get me and he would get another chance to assault me."  (ECF No. 102 at 112).  Ferguson's incident report further states that Plaintiff "spit in my direction."  (*Id.*)  Defendants further contend that Plaintiff attempted to chew through his spit mask, constituting aggression necessitating continued restraint.  (ECF No. 106, Ex. 1 at 51-52).

Defendants' memorandum in support of their motion further asserts that Plaintiff has no evidence that Defendant Ferguson was aware of and was deliberately indifferent to any actual serious risk to Plaintiff. Rather, they assert, Plaintiff is "attempting to impute knowledge as to Plaintiff's behavior (that he was compliant), demeanor (that he was calm), and condition (that he was suffering), which the officer did not have." (ECF No. 94 at 11). Likewise, they assert that the record is devoid of any evidence that Defendants Littlejohn, Hendricks, or Chaffin were "aware of facts from which the inference can be drawn that a substantial risk of serious harm exists," and they in fact drew that inference." *Farmer*, 511 U.S. at 834. (*Id.* at 12). Their memorandum further states, "[i]n fact, they knew from experience and personnel observation that no risk of serious harm existed, and that from Plaintiff's behavior and comments it was unsafe to let Plaintiff out of the restraint chair because he posed a real threat of further violence against the officers." (*Id.* at 12-13).

Plaintiff, on the other hand, asserts that the video evidence demonstrates that, once he was on the ground, he was not resisting and was compliant while being placed in the restraint chair. He further denies spitting at any of the officers and contends that he was spitting OC into his own lap. (ECF No. 106, Ex. 1 at 36-37). However, the video evidence demonstrates at least one instance where Plaintiff raised his head and spit straight out in the vicinity of Defendant Littlejohn, who was restraining his right ankle. (ECF No. 95 between 4:37:25 and 4:37:27). At that point, Ferguson directed that a spit hood or mask be placed on Plaintiff. (*Id.* at 4:37:29-30). It appears that Plaintiff then states, "I can get it off" and Ferguson appears to say, "You can chew it off." (*Id.* at 4:37:30-32). Plaintiff further maintains that, once moved from the booking area, he "no longer

posed a threat," and remained quiet and compliant, other than to advise the correctional officers and the nurse who checked on him that he couldn't breathe and was in pain. (ECF No. 106, Ex. 1 at 52). He further asserts that he attempted to chew through the spit mask placed over his head only because he was "trying to breathe." (*Id.* at 51-52).

As evident from the surveillance video, less than one minute after Plaintiff was moved out of the booking area, a voice (believed to be Plaintiff's) can be heard repeatedly yelling, "I can't breathe." Shortly thereafter, another male voice can also be heard saying, "I don't feel sorry for you." (ECF No. 95 between 4:40:08-4:41-00). However, there is no other video or documentary evidence to support or refute the parties' contentions concerning Plaintiff's behavior and condition once he was removed from the booking area.

Nonetheless, Plaintiff testified that, despite his compliance, and in the face of his pleas for assistance, Ferguson came to the interview room and "talked crap," including the following statements: "Fuck you. You'll learn not to assault another CO again. I hope you sit in that chair and burn and you can't breathe." (ECF No. 106, Ex. 1 at 60-61). He further testified that Chaffin made similar comments throughout the time that he was charged with monitoring Plaintiff. (*Id.* at 63-64). Such comments in the face of Plaintiff's alleged pain and suffering while denying him decontamination over a course of hours is sufficient to give rise to an inference of malice and deliberate indifference. Defendants do not provide any deposition testimony, affidavits, medical reports, or other evidence to contradict Plaintiff's sworn testimony.

In light of Plaintiff's assault of Akers and Ferguson and his continued volatile behavior, the evidence may support the decision to initially restrain Plaintiff to ensure

26

that he was compliant and that the officers charged with placing him in the restraint chair were simply following orders.  Furthermore, it is undisputed that, after Plaintiff was initially restrained and moved from the booking area, Defendants Akers, Hendricks, and Littlejohn returned to their normal duties and had no responsibility for holding Plaintiff in the restraint chair without decontamination or the decision of when he should be released.  (ECF No. 106, Ex. 1 at 58-63).

Accordingly, even taken in the light most favorable to Plaintiff, the evidence of record fails to establish that Defendants Akers, Hendricks, or Littlejohn acted maliciously or sadistically in order to cause Plaintiff harm or in deliberate indifference to his safety or serious medical needs.  Therefore, the undersigned proposes that the presiding District Judge **FIND** that Defendants Akers, Hendricks, and Littlejohn are entitled to qualified immunity and judgment as a matter of law on Plaintiff's Eighth Amendment claims against them.  *See Miller v. Ballard*, No. 2:14-cv-16868, 2017 WL 1016930, at *9 (S.D.W. Va. Feb. 21, 2017), *report and recommendation adopted*, 2017 WL 971045 (S.D.W. Va. Mar. 13, 2017) (granting summary judgment on Eighth Amendment claim to officers who placed inmate in restraint chair upon orders of another and who did not participate in any part of his supervision thereafter).

However, there appears to be a genuine dispute of fact concerning the need to continue to restrain Plaintiff without a shower or any other form of decontamination for approximately four hours.  The evidence of record demonstrates that those decisions were initially made by Defendant Ferguson, and enforced by Defendant Chaffin, who was charged with monitoring Plaintiff, and Plaintiff has testified under oath that these defendants made comments to him from which an inference of malice may be drawn.

Taking that evidence in the light most favorable to Plaintiff, a reasonable jury could believe that Defendants Ferguson and Chaffin acted with wantonness in the infliction of pain and with deliberate indifference thereto, in clear violation of the Eighth Amendment. Therefore, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact concerning Plaintiff's claims against Defendants Ferguson and Chaffin and, thus, those defendants are not entitled to qualified immunity or judgment as a matter of law on Plaintiff's Eighth Amendment claims against them.

### III. RECOMMENDATIONS

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Correctional Defendants' motion for summary judgment (ECF No. 92) with respect to the issue of exhaustion of administrative remedies and Plaintiff's Eighth Amendment claims against Ferguson and Chaffin, but otherwise **GRANT** their motion with respect to Plaintiff's Eighth Amendment claims against Akers, Hendricks, and Littlejohn. It is further respectfully **RECOMMENDED** that the presiding District Judge **DENY** Vallandingham's motion for summary judgment (ECF No. 97) with respect to the issue of exhaustion of administrative remedies, but otherwise **GRANT** her motion. Finally, to the extent that Plaintiff's response document (ECF No. 102) is also deemed to be a motion for summary judgment on Plaintiff's behalf, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** that motion.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

plaintiff shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties and to Judge Chambers.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to the plaintiff, and to transmit a copy to counsel of record.

February 8, 2022

Dwane L. Tinsley
United States Magistrate Judge